# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JONATAN PEREZ,<br><br>              Petitioner,<br><br>    v.<br><br>J. ENGLEMAN, Warden,<br><br>              Respondent. | Case No. 2:23-cv-03105-GW (SK)<br><br>**REPORT AND RECOMMENDATION TO DENY HABEAS PETITION** |

## I.

Petitioner Jonatan Perez is a federal inmate in the custody of the Bureau of Prisons (BOP) who lost 41 days of good-conduct-time credit (among other sanctions) after a BOP disciplinary decision finding that he had engaged in conduct disrupting or interfering with prison security and operations. Petitioner was identified in a public TikTok video made with a contraband cellphone showing him and several other inmates preparing, cooking, or eating contraband food inside a low-security federal prison camp. Claiming that he was disciplined with insufficient evidence of guilt in violation of federal due process, petitioner now seeks to restore his lost credits (and expunge his disciplinary record) under 28 U.S.C. § 2241. But because the BOP's disciplinary decision was objectively supported by "some evidence"—the minimal quantum of evidence needed to satisfy procedural due process in the prison setting—petitioner is not entitled to federal habeas relief. Thus, his habeas petition under § 2241 should be denied.

II.

In 2022, BOP officials received an anonymous online tip from the public reporting a TikTok video showing inmates preparing, cooking, or eating contraband food. (Declaration of Antonietta Estrada (ECF 7-1) at 26, 32). BOP investigators determined that the video had been made with a cellphone inside the Tucson, Arizona low-security prison camp where petitioner was then incarcerated. (Estrada Decl. at 26-27). Among the inmates in the video, petitioner was identified by distinctive tattoos matching those on his forearms. (*Id*. at 34-36). In a screenshot from the video, petitioner's arms and hands were seen at close range cutting and handling lobsters:



(*Id*. at 36). When interviewed, the suspected inmates remarked that it was "very easy and convenient" to get contraband food into the prison camp. (*Id*. at 34). Petitioner added that "he used to be a Chef" and "would help cook

inside the dorm and help others make food." (*Id.* at 30). But he denied knowing "anything more than that" about the TikTok video. (*Id.*).

Meanwhile, BOP investigators never found the cellphone used to record the TikTok video or determined whose smuggled cellphone may have been used. (*Id.* at 34). Nor did their investigation ever uncover who created or posted the TikTok video.[1] It was only nearly a month after the investigation started when a BOP employee wrote in a staff memo that, during the employee's routine prison rounds from two weeks before, petitioner allegedly "acknowledged his involvement in posting social media videos" while at the prison camp. (*Id.* at 24). It was unexplained, though, how much weight (if any) that staff memo was given during the BOP investigation. According to their reports, BOP investigators relied mainly on the TikTok video screenshots and other documented witness statements to conclude that eight inmates—including petitioner—"were video recorded and or [sic] contributed to the illicit activity at the Satellite Prison Camp, Tucson, by means of the social media application, 'TIKTOK'." (*Id.* at 34).

No express BOP regulation, however, prohibits video recording or social media posting as such. BOP investigators thus had to rely on a catchall regulation—as pertinent here, prison code 199—prohibiting conduct that (a) disrupts or interferes with the security and orderly operation of a BOP facility, and (b) is "most like" an otherwise expressly prohibited act. *See* 28 C.F.R. § 541.3. Since cellphones or similar electronic devices— essential to creating video content or posting it on social media—are of course banned inside federal prisons, petitioner and the other inmates

---

[1] The user handle for the TikTok account (@juanlo81096743914) was evidently neither self-identifying nor traceable to any of the inmates in the video. Shortly after the BOP investigation began, someone removed the video from the public TikTok website. (ECF 11-1 at 3). But investigators did not preserve a digital copy of the video before it was removed and captured only screenshots instead. (*Id.* at 3-4).

3

identified in the TikTok video were each charged in an incident report with generally prohibited disruptive conduct most like the expressly prohibited possession, introduction, or use of a contraband device. (Estrada Decl. at 6, 34).

That charge carried serious disciplinary consequences for petitioner, including the loss of good-conduct-time credits. Thus, his incident report had to be addressed at two hearings according to BOP regulations—first with a Unit Discipline Committee (UDC) and then with a Disciplinary Hearing Officer (DHO). (*Id*. at 21). In the UDC proceedings, petitioner declined to comment—both to the assigned investigator and at the hearing—even though he was advised that an adverse inference could be drawn from his silence. (*Id*. at 22-23). So the UDC adopted the findings of the incident report, agreed that petitioner had committed disruptive conduct most like use of a prohibited cellphone, and referred the matter to a DHO as required by regulation. (*Id*. at 21-23). Then, before the assigned DHO, petitioner waived his rights to have staff representation, to call witnesses, and to present documents. (*Id*. at 17). But this time he denied the charge, stating that he "didn't know [he] was being recorded" and "was not a willing participant in the video." (*Id*. at 16, 18). He also submitted a written statement reiterating that he was "not aware of being in a video" and adding that he was "never in possession of a phone." (*Id*. at 39).

But the DHO did not find petitioner credible at the disciplinary hearing. Discrediting especially his claimed ignorance of being recorded, the DHO found that the "close proximity" of the cellphone camera "clearly" recording petitioner "preparing food," as shown in a video screenshot, made it "not likely" that he would have had "no knowledge of being recorded." (*Id*. at 18). And petitioner otherwise conceded (as he had to) that he was shown "eating and preparing" lobsters in the video, for which he expressed "regret"

4

and accepted the "consequences." (*Id.* at 18, 39). The DHO thus found by the "greater weight of the evidence" that petitioner had to have known that he was being filmed by a cellphone while handling contraband food. (*Id.* at 18). She added, though, that petitioner was also "complicit" in the posting of the TikTok video just because he was "part of the reported incident and had knowledge of cell phones being used" at the camp. (*Id.*). To make those findings, the DHO relied on the official incident report, the underlying investigative reports and staff memos, the TikTok video screenshots, and the results of the UDC proceedings. (*Id.* at 17-18). And given those findings, the DHO concluded that petitioner had committed conduct "which disrupts or interferes with the security or orderly running of the institution" most like "[p]ossession" or "introduction" of a "cellphone." (*Id.*). The DHO then sanctioned petitioner with the loss of 41 days of good conduct time, among other disciplinary sanctions, as permitted by BOP regulations. (*Id.* at 19).

      Petitioner administratively appealed those sanctions. (ECF 1 at 30-31, 34-35). In those appeals, he again disclaimed knowing that he was being filmed, asserting that the DHO's finding about the "close proximity" of the cellphone camera to infer his knowledge was "sheer speculation" since someone could have been using the camera's "zoom" function from a distance. (*Id.* at 31). Otherwise, in petitioner's view, the DHO had no "definitive evidence" that he was "aware of" being recorded by a cellphone. (*Id.*). He added that to find he had engaged in disruptive conduct, the BOP had to prove he "willfully participated in producing" the TikTok video posted online. (*Id.*). But since the investigation never connected him to the TikTok account, nor uncovered the cellphone used to create or post the video, petitioner maintained that there was no evidence he intentionally participated in the production or posting of the video—contrary to the DHO's finding that he was "complicit" in those acts. (*Id.*). He insisted that the BOP

needed more evidence than just his awareness of being recorded—even though he was handling contraband food—to find him guilty of disruptive conduct. (*Id.* at 35). But at each level of his appeals, the BOP affirmed the DHO's disciplinary decision. (*Id.* at 32, 36). So after unsuccessfully pursuing those administrative remedies, petitioner filed for federal habeas relief here under § 2241.

### III.

Federal regulations direct the BOP to "establish and exercise controls to protect individuals" under its custody and to ensure "the security, discipline, and good order of [each] institution" under its purview. 28 C.F.R. § 540.12(a). To those ends, the BOP may impose disciplinary sanctions when inmates commit certain prohibited acts. *See* 28 C.F.R. § 541.3(a). Those prison offenses are categorized by four severity levels with the most serious—described as being of "Greatest" severity—found in the 100-series of prison codes.[2] *See* 28 C.F.R. § 541.3, Table 1. Under the last code within that series—prison code 199—an inmate may be charged with disrupting or interfering with the "security or orderly running" of a BOP facility. *Id.* But because code 199 is a catchall provision, it may only be used "when another charge of Greatest severity is not accurate." *Id.* So to charge an inmate under prison code 199, the alleged disruptive conduct must also be alleged as "most like" one of the listed Greatest severity prohibited acts within the 100-series codes—*e.g.*, possession of a contraband cellphone as prohibited by code 108. *Id.* Applying those pertinent regulations here, as outlined earlier, the BOP charged petitioner with disruptive conduct (prohibited by code 199) most like possession or introduction of a cellphone (prohibited by

---

[2] In descending order, the other three categories of prohibited acts are "High," "Moderate," and "Low" severity offenses, which are each respectively listed in the 200-, 300-, and 400-series of prison codes. 28 C.F.R. § 541.3, Table 1.

code 108).

If found to have committed one of the Greatest-severity offenses, including disruptive conduct prohibited by code 199, federal inmates are subject to loss of good conduct sentencing credit among other serious disciplinary sanctions. *See* 28 C.F.R. § 541.4. As a result, the Due Process Clause of the Fourteenth Amendment requires that prisoners be given certain procedural protections during disciplinary proceedings.[3] *See Sandin v. Conner,* 515 U.S. 472, 484 (1995). "Prison disciplinary proceedings are not part of a criminal prosecution," however, so "the full panoply of rights due a defendant in such proceedings does not apply." *Wolff v. McDonnell,* 418 U.S. 539, 556 (1974). Instead, prison disciplinary decisions must be reviewed with the utmost deference. *See Castro v. Terhune*, 712 F.3d 1304, 1314 (9th Cir. 2013). That means federal courts may not "set aside decisions of prison administrators" on collateral review unless the decisions are "so devoid of evidence" as to have no "basis in fact" or to be "otherwise arbitrary." *Superintendent v. Hill*, 472 U.S. 445, 456–57 (1985). Put in standard-of-review terms, so long as a disciplinary decision is supported by "some evidence," it must be upheld on federal habeas review. *Id.* at 455–56.

In the face of that exceedingly deferential standard of review, petitioner claims that the DHO's disciplinary decision was unsupported by sufficient evidence to find that he had engaged in disruptive conduct under the BOP's applicable prison codes. But as the label implies, the some-evidence standard is "minimally stringent." *Cato v. Rushen,* 824 F.2d 703, 705 (9th Cir. 1987). It does not permit "examination of the entire record,

---

[3] The minimum required procedures include written notice of the charges before a hearing; an opportunity to call witnesses and present evidence; and a written statement by the factfinder of the evidence relied on and the reasons for the disciplinary action. *See Wolff v. McDonnell*, 418 U.S. 539, 563–67 (1974). Petitioner does not claim that he was denied any of these essential procedures. (*See* ECF 1 at 2; Estrada Decl. at 3-6).

independent assessment of the credibility of witnesses, or weighing of the evidence." *Hill*, 472 U.S. at 455. The only "relevant question is whether there is *any* evidence in the record that *could* support the conclusion reached by the disciplinary board." *Id.* at 455–56 (emphasis added). Objectively, there was enough such evidence here insofar as the DHO found that petitioner had knowingly permitted someone with a contraband cellphone to film him preparing contraband food.

    It was undisputed, for starters, that petitioner was one of the inmates shown in the TikTok video preparing and cooking lobsters—undeniably contraband food—while in BOP custody. It was also undisputed that someone in the prison camp (even if unidentified) used a contraband cellphone to record the video of petitioner handling those lobsters. And while the DHO could not find petitioner guilty based solely on his decision to remain silent during the UDC proceedings, she could still draw an adverse inference of petitioner's culpability based on his silence when asked to admit or deny the charges in those proceedings. *See Baxter v. Palmigiano,* 425 U.S. 308, 318 (1976); *see also* 28 C.F.R. § 541.5(b)(1)(B). In the face of those facts, then, petitioner has not met his burden to show—under the highly deferential some-evidence standard—that the DHO's decision was "so devoid of evidence" that it lacked any "basis in fact" or was "otherwise arbitrary." *Hill*, 472 U.S. at 456–57.

    To be sure, petitioner consistently denied (and continues to deny) knowing that he was being recorded with a cellphone. He claimed, for instance, that someone could have recorded him surreptitiously by using the camera-phone's zoom feature from a distance. But the DHO was not compelled to accept that theory or to blindly credit petitioner's claimed ignorance of being filmed while preparing contraband food. Nor did the DHO need, as petitioner maintained, "definitive evidence" of his awareness

8

that he was being filmed—she needed only "some evidence."  And by that standard, the DHO could have objectively relied on the apparent close camera angle to petitioner—as revealed on the face of an incriminating video screenshot—to find his professed ignorance of being filmed not credible.  Of course, that is not the only permissible inference that the DHO could have drawn from the screenshot (including possibly for some reasons posited by petitioner).  But federal due process "does not require evidence that logically precludes any conclusion but the one reached by the disciplinary board." *Hill*, 472 U.S. at 457.  What matters instead is only whether the BOP's determination was rational, not whether it was right or whether a federal court would reach a different decision in the first instance.  By those lights, it was objectively reasonable for the DHO to infer petitioner's awareness of being recorded with a cellphone based on the record evidence, including the facially incriminating video screenshot.  *See, e.g.*, *Sandoval v. Mitchell*, 753 F. App'x 520, 520 (9th Cir. 2019) (finding incident report and inculpatory photographs adequate to meet "some evidence" standard).

       Petitioner also challenges, however, the DHO's added finding that he was "complicit" in the creation or posting of the TikTok video itself.  He maintained below, for instance, that there was no evidence of his "willful participation" in the production of that video as such.  And he also points to the lack of any evidence establishing even his knowledge of the video's apparent purpose—online posting through the public TikTok platform.  In petitioner's view, such intent or (at least) knowledge is needed to find him guilty of disruptive conduct because, without it, inmates engaging in otherwise innocent behavior behind bars would be guilty of such conduct anytime they are passively filmed by someone else—even if they don't consent to (or even if they happen to be aware of) being filmed with a contraband device.  But contrary to petitioner's assertions, it was

9

unnecessary for the DHO to find that he intentionally planned or participated in the production of public social media content—on top of finding that he knowingly permitted an illicit recording of him preparing contraband food—to find him guilty of disruptive conduct.

For one thing, nothing in prison code 199 suggests it requires specific rather than just general intent to find an inmate guilty of disruptive conduct. *See, e.g.*, *Tomlinson v. Caraway*, 2014 WL 4656429, at *3 (C.D. Cal. July 16, 2014) (finding petitioner's knowledge of carrying contraband generally sufficient for violating code 113 even with no specific intent to carry specific contraband type); *see also United States v. Brice*, 926 F.2d 925, 929–30 (9th Cir. 1991) (regulations silent on mens rea are presumed to proscribe general intent offenses only). And for another, unlike his hypothetical inmate unwittingly recorded doing innocent activities, petitioner was not filmed engaging in innocent conduct—he was recorded while doing something undeniably prohibited in prison: cooking and eating lobsters. It is one thing to maintain that the BOP may not discipline an inmate for disruptive conduct for no reason other than that he may have been captured by illicit video—without his consent or knowledge—while engaged in otherwise authorized or innocent conduct. It is altogether different, however, to claim that the BOP cannot treat the preparation of contraband food—while being knowingly filmed with a contraband device—as disruptive conduct unless the inmate either intended the recording to be posted online or knew what it would be used for afterward.

While there might be a question about the BOP's authority to punish in the first scenario, the BOP must have discretion to discipline in the latter no matter an inmate's knowledge or intent about the video's purpose. After all, even if an unauthorized recording of inmates preparing contraband food is not disseminated online, it takes no imagination to see that prison officials

can view an inmate's decision to still be filmed—with smuggled food in a video made by a contraband device—as conduct disruptive to the prison's security and operations. *See Bell v. Wolfish*, 441 U.S. 520, 547 (1979) (Prison officials "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."). Undeterred and unpunished, such conduct could encourage further smuggling, possession, and use of contraband food, devices, or weapons, and much more besides. *See id.* at 550–51 (recognizing that contraband smuggling is "an obvious security problem" in prisons); *Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 566 U.S. 318, 327 (2012) ("Policies designed to keep contraband out of jails and prisons have been upheld in cases decided since *Bell*.").

And such unauthorized underlying conduct here—permitting video recording by a prohibited device while handling prohibited items—is what distinguishes petitioner's case from one where an inmate is perhaps knowingly filmed but only while engaging in authorized conduct.[4] So even if there were insufficient evidence that petitioner intentionally helped produce the TikTok video or knew that the recording of him would be posted online, the BOP's disciplinary decision can still be upheld based on the credited evidence that petitioner knowingly took part in an unauthorized video

---

[4] Even respondent recognized at the hearing in this matter that, for instance, an inmate taking a shower or working out in the exercise yard would not be guilty of disruptive conduct under prison code 199 just because those activities happen to have been recorded by someone using a contraband cellphone—at least with no evidence that the filmed inmates either possessed the contraband device (even if only constructively) or otherwise controlled and perhaps directed the cellphone's use in those circumstances. After all, even general intent offenses require that a prohibited act be "volitional (as opposed to accidental)." *United States v. Lamott*, 831 F.3d 1153, 1156 (9th Cir. 2016).

11

recording by a contraband device while handling contraband food.[5] *See* 28 C.F.R. § 541.8(a)(1) (disciplinary sanction may be imposed based on finding that inmate committed either the prohibited act charged in incident report "or a similar prohibited act[] described" in report).

## IV.

For all these reasons, it is recommended that the petition under 28 U.S.C. § 2241 be denied and that this action be dismissed with prejudice. *See* 28 U.S.C. § 636(c); G.O. 05-07.

Dated: April 24, 2024

STEVE KIM
United States Magistrate Judge

---

[5] Of course, if the court were to treat the staff memo of the BOP employee claiming that petitioner "acknowledged his involvement in the posting of social media videos" as reliable evidence of petitioner's knowledge about the purpose of the illicit video, it would have to conclude that "some evidence" supported the DHO's finding about petitioner's complicity in the production and posting of that video. (*See* Estrada Decl. at 24). But it is questionable whether that staff memo—created a month after the posting of the TikTok video, written two weeks after petitioner's alleged admission, and documented with not even a hint of how petitioner supposedly "acknowledged" his involvement—holds even the minimum indicia of intrinsic reliability as evidence of a party admission. *See generally Toussaint v. McCarthy,* 926 F.2d 800, 802–03 (9th Cir. 1990); *Cato,* 824 F.2d at 705. For the reasons explained, however, the court need not reach that issue to resolve this petition.